Connors, Thomas A., J.
The plaintiff, Debra Callahan, has sued the defendant, The Norfolk & Dedham Group, in a complaint which has two counts surviving to trial, each of which alleges a violation of a separate provision of General Laws c. 176D and through that a violation of c. 93A. Trial on the case was conducted by the court without jury on May 26, 27, 28, and 29 and on June 1 and 2. Findings of Fact, the court’s ruling, and order for entry of judgment on the case follow.
Findings of Fact
1. Deborah Callahan was a passenger in a Chevrolet Blazer operated by Paula Parsons as it was proceeding on Route 114 near the Lawrence/North Andover line on September 24, 2004 at about 9:00 P.M. The two, who were a couple in a long-term committed relationship, were returning to their residence in Gloucester from a movie theater in Haverhill. They co-owned the vehicle.
2. As the vehicle was traveling, it came to an intersection with Waverly Road, which was controlled by a traffic light. Across the intersection, a Jeep Grand Cherokee operated by Robert Fairman, waited on Route 114 to take a left turn onto Waverly Street. At that location, the roadway broadens to two lanes, with the left lane which Fairman was in dedicated for left turning vehicles, which would bring such turning vehicle into the path of a vehicle proceeding straight ahead in the opposite direction.
3. As the Blazer was proceeding through a green light, it was in collision with the Jeep. The front end of both vehicles came in contact, with the impact of collision to the driver side front of the Blazer and somewhat to the passenger side front of the Jeep, resulting in very heavy damage to both. (Exhibit 6, A-H.)[1]
4. An ambulance was called and medical personnel dealt with Callahan who was the most seriously injured in the collision. She was transported to Beverly *230 Hospital, where she had surgery for a broken leg. She was in-patient for one week.
5. On September 24, prior to Callahan’s release from the hospital, Parsons went to her insurance agent, the Favazza Johnson Agency in Gloucester. That agency handled the auto insurance policy for the vehicle placed with The Norfolk & Dedham Group (Norfolk).
6. Parsons filled out an Accident Report form, Exhibit 8, and spoke with David Amero of the agency. She told him that she had been proceeding through a green light and was struck head-on by the other vehicle.[2]
7. On September 27, Parsons spoke with Judith Karvelas, a second employee of Favazza Johnson. Parsons told her that the accident happened when the Fairman vehicle suddenly turned left in front of her vehicle. Karvelas wrote down that statement along with other information about the accident on an “Accord” report form which she faxed to Norfolk. (Exhibit 9B.)
8. That form was received by Mary Longo, a senior claims examiner for Norfolk. Longo engaged Mark Shepherd owner of Bistany Investigations to conduct a full investigation of the accident and of any claims that might result. Bistany did all or most of its investigation business on behalf of Norfolk.
9. Shepherd went to the North Andover police station where he requested a copy of a police report done on the accident. The report, which he received several days later, had been written by Sergeant Eugene Salois who had arrived at the accident scene after the ambulance crew had already attended to Callahan.[3]
10. Fairman had still been at the accident scene when he had been interviewed by Salois. The officer determined that the accident had resulted from the Fairman vehicle turning left and crossing into the right of way of the Blazer. Salois determined that while the vehicles had collided at some angle, the collision was much closer to head-on than to a “T-bone” angle, and he included in the report which he filed a diagram depicting how he believed the accident had occurred. (Ex. 54.)
11. Salois also learned from Fairman that he did not have a Massachusetts driver’s license, and that his New Hampshire license was under suspension as a result of a driving under the influence conviction. He gave Fairman a citation for the civil infraction of failure to yield and the criminal offense of operating after revocation of license.
12. As part of his investigation, Shepherd telephoned Paula Parsons. She informed him that she had retained an attorney, Elizabeth O’Connor, to represent her on the case, and Shepherd did not speak to her further.[4]
13. Shepherd went to the apartment complex in North Andover veiy near the accident scene which was listed as Fairman’s address for the purpose of interviewing him concerning details of the accident. Fair-man agreed to speak with Shepherd over the intercom from the entrance to the complex, but would not let him come inside, nor would he allow any statement of his to be recorded.
14. Fairman acknowledged to Shepherd that his vehicle was registered in New Hampshire from where he had recently moved, and that he had let his insurance lapse. He stated that he had been in the left turn lane at the time of the collision, and he opined that the Parsons vehicle must have been speeding because he would never have cut in front of an approaching car.[3] He acknowledged that he had been cited for the civil and criminal infractions stemming from his operation of his vehicle during the accident, and he provided Shepherd with the name of the criminal attorney who would be representing him.
15. Shepherd drafted a report sent to Longo outlining his activities and appending Sgt. Salois’ accident report. He concluded in his report that the Parsons’ vehicle had had the right of way when Fairman’s Jeep had encroached into Parsons’ lane. He opined that Fairman was totally at fault for the accident and that there was no evidence that Norfolk’s insured had been contributorily negligent.
16. Longo wrote a memorandum to her file which noted the status of the investigation. (Exhibit 11.) While she accepted that liability appeared to rest with Fairman, she concluded that this issue was not yet finalized, and she urged that interviews with Parsons and Callahan would need to be completed before exposure for a bodily injury claim against Parsons could be ruled out, noting that it could be triggered by a finding that Norfolk’s insured was even one percent at fault.
17. Shepherd contacted Attorney O’Connor to arrange to interview her client, Parsons. He learned that Callahan, whom she had also originally represented, had been referred to Attorney Joseph Abramowitz, as a conflict existed since Parsons was potentially liable to her for her injuries.[6]
18. On November 4, Shepherd met with Parsons and O’Connor to take the former’s statement about the accident. Parsons described the accident stating that the light had been green and she had been traveling at a normal speed. The statement which she gave, however, evinced a poor recollection as to many details about the accident. She also insisted that a sentence that she had been paying attention at the time of the accident be deleted from her statement.[7] (Exhibit 13.)
19. Attorney Abramowitz contacted Longo by mail two days after Parsons’ interview telling her that his client was pursuing a claim against Parsons under her bodily injury policy. That letter acknowledged that Fairman appeared the primarily responsible party, but that Parsons bore some blame for the collision. He asserted that just prior to the accident, Callahan *231 “yelled ‘watch out’ or words to that effect, adding that if Parsons had been paying attention, the accident would not have taken place.” (Exhibit 72.)
20. On November 8, Shepherd wrote his final report to Longo at Norfolk concerning his investigation of the accident, which report ran over seven pages. The report outlined primarily his interviews with Parsons and Callahan, and discussed at length the former’s reluctance to state that she had been paying attention at the time the collision occurred. Shepherd’s report noted the congruence of Callahan’s and Parsons’ statements which appeared, compared to initial statements made by Parsons to her agent, to enhance the case for the possibility of her negligence having contributed to the accident.[8] Shepherd opined that he believed that this was by design to advance Callahan’s claim for bodily injury benefits.
21. Longo who was an experienced claims handler had come to believe that the accident was solely attributable to Fairman’s negligence, based upon the information which she had received. By November 16, she had decided to deny Callahan’s claim that she was entitled to damages under Parsons’ bodily injury policy. (Exhibit 11.)
22. Suit was filed by Attorney Abramowitz on Callahan’s behalf in Essex County Superior Court against both Fairman and Parsons. Attorney Mazurczak of Melick, Porter & Shea, who had been retained by Norfolk to represent its insured, filed a responsive pleading and conducted discovery.
23. When Mazurczak met with Parsons in connection with his representation of her legal interest in the case, Attorney O’Connor accompanied her and was involved in their discussions of the case. She was also present when Parsons was deposed in connection with the case, and she was involved in the responses which Parsons submitted through Mazurczak to Fairman’s discovery requests, suggesting changes to responses on particular Interrogatories. (Exhibit 79.)
24. In his case preparation on behalf of Callahan, Attorney Abramowitz had visited the accident scene in October 18, 2004. When he did, he had been accompanied by O’Connor. During the pendency of the case, the two had had discussions concerning the status of Callahan’s claim and Parsons’ recollections of the accident.[9]
25. After the depositions of Fairman and the other parties had been conducted, Mazurczak had come to the view that Fairman would not be a good witness at trial and that his attempt to deflect blame for the accident from himself was not likely to be credited. He held the view that the accident wholly had been Fairman’s fault, and he conveyed that opinion to Longo.
26. In connection with his representation of the legal interests of Parsons, Mazurczak hired an accident reconstruction expert, Dennis Burgess, to perform a collision analysis in preparation for trial. After viewing materials concerning the accident, including the photographs, Burgess arrived at the conclusion, which he later testified to at trial, that the accident had resulted from Fairman’s sudden left turn in front of the Parsons vehicle.
26. On January 12, 2006, Abramowitz mailed to Longo a c. 93A demand letter in which he asserted that Norfolk’s insured Parsons was partially responsible for Callahan’s injuries. (Exhibit 17.) He made a demand of $150,000.00 to settle the claim, noting that this was a reduction from a $ 195,000.00 demand he earlier had made, and stated his intention to pursue a claim for unfair claims settlement practices on Callahan’s behalf were a reasonable offer of settlement not made.[10]
27. Longo responded within thirty days disputing the assertion that its insured had been at fault in the accident. The letter asserted that the investigation had shown that the accident had been caused solely by Fairman’s sudden intrusion into Parsons’ proper lane of travel, and it offered $5,000.00 to have the matter resolved.
28. In January of 2007, the auto tort case proceeded to trial at Lawrence. A jury verdict was returned which found no liability for the accident on Fairman’s part, and adjudged Parsons one hundred percent responsible, awarding Callahan damages of $150,000.00. With interest, a Judgment entered that month in the amount of $187,479.78.
29. During January of 2007, an agreement was reached between Callahan and Norfolk through which she was paid $160,000.00 in satisfaction of her claim against Parsons, and the automobile tort case was terminated without appeal. Following payment of the insurance proceeds to Attorney Abramowitz on Callahan’s behalf, he had issued a check to Callahan for $93,830.23, representing the amount due her after deduction for expenses and the attorney’s contingent fee.[11]
30. On February 5, 2007, Abramowitz issued a check to Parsons’ attorney, O’Connor, from the proceeds from Parsons’ insurance policy received from Norfolk in the amount of $20,666.66, endorsed as “D. Callahan — referral fee.” At some time during 2008, O’Connor returned the funds represented by the check to Abramowitz.
31. The following month, Callahan filed this action seeking damages from Norfolk for unfair claims settlement practices.
Ruling
The plaintiff is asserting two claims against the defendant both arising under G.L.c. 176D, §3(9)(d) and (f). These provisions of the statute prohibit an insurer from failure to pay claims without having conducted a reasonable investigation based upon all available information, and from failing to effectuate prompt, fair and equitable settlements of claims in *232 which liability has become reasonably clear. Any violation of the terms of that statute would amount to a violation of c. 93A, the consumer protection act, which bars unfair and deceptive acts or practices in trade or commerce. Hopkins v. Liberty Mutual Insurance Company, 434 Mass. 556, 564 (2001). The interplay between the two statutes would subject an entity which violated the provisions of c. 176D to double or treble damages and the assessment of reasonable attorneys fees as provided for in c. 93A. Kapp v. Arbella Mutual Insurance Co., Inc., 426 Mass. 683, 684 (1998).
Whether liability for a claim is “reasonably clear” calls for the application of an objective standard of inquiry into the facts of the claim at issue and into the pertinent law. Demeo v. State Farm Insurance Co., 38 Mass.App.Ct. 955, 956 (1995). The objective test for determining liability is whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff. Id. at 956-57.
Evaluating possible liability under the statute encompasses the question of both fault and damages. Clegg v. Butler, 424 Mass. 413, 421-22 (1997). Further, insurers are entitled to the time to undertake a thorough investigation of the claim, and they are not to be penalized for delay which is occasioned by further investigation conducted in good faith where liability is not clear. Id. Finally it is significant to note that notwithstanding the obligation which an insurer bears under the provisions of c. 176D to ensure that claimants are treated fairly, it is not to be second-guessed for a legitimate and good faith belief concerning a claim which later turns out not to have been true, as a good faith but mistaken belief as to the merits of a claim will not furnish a basis for insurer liability. See O’Leary-Allison v. Metropolitan Property & Casualty Co., 52 Mass.App.Ct. 214, 218 (2001).
The plaintiff in the present case contends that the insurer, Norfolk, contravened the statute by two specific but related means. Her primary contention is that the carrier failed her by its refusal to have offered a significant sum commensurate with her damages from the accident on the basis that the liability of its insured, Parsons, had become reasonably clear. She further alleges that this failure to have recognized its financial responsibility to her as an accident victim was caused by Norfolk’s failure to have conducted a proper and appropriate investigation of her claim and of the accident.
The issue of the damages suffered by Callahan in the accident are not part of the controversy between the parties, as the insurer concedes that her injury, which involved a serious fracture with week-long inpatient hospitalization, and substantial medical expenses, was significant. Further, as a passenger in one of the two vehicles involved in the collision, there is no issue of any comparative negligence on her part. The sole questions for determination are whether Norfolk’s judgment that its insured Parsons was not liable amounted to an inequitable failure to Callahan, in the circumstances of the case, and the related question whether that judgment had been reached as a result of an inadequate investigation of that issue of liability.
At the time that Norfolk through its senior claims manager Longo reached the determination that their insured was not responsible for the accident, it had secured significant information about the accident. It had learned initially from its agent, Favazza Johnson that its insured, Parsons, had reported the accident and had submitted initial report forms apprising the carrier of the accident’s circumstances. The accounts provided reflected that Parsons had had the right of way while proceeding through the green light, and had been in collision when the Fairman vehicle had moved from its position in the turning lane into her vehicle’s path of travel. Norfolk had hired an investigator, Shepherd, to look into the accident’s cause, and his telephone conversation with Parsons, brief though it was, did nothing significantly to undermine that initial information in the insurer’s hands that its insured had not been in the wrong.
The information which was secured from the police accident report was strongly supportive of the position that the accident had stemmed solely from Fairman’s negligence. The photographs of the scene and of the vehicles themselves, further, did not weaken the case for liability, the latter demonstrating damage to the front ends of each vehicle, somewhat off center, reflecting a collision caused by Fairman turning improperly into the path of the Blazer. It is true that in his initial conversation with Shepherd conducted over the apartment intercom, Fairman was beginning to assert that excessive speed on Parsons’ part may have played a role, as he contended that he would not have cut in front of her vehicle to cause an accident. However, no information from Parsons, or Callahan, or from the observations made by Sergeant Salois, provided a basis for the contention that Parsons had been proceeding through her green light at an improper rate of speed. The conclusion that Salois implicitly had reached when he had cited Fairman for failure to yield that responsibility for the collision rested with him was consistent with the credible and supported information available to Norfolk at the time that it reached the determination that its insured Parsons was not liable.
As the matter was proceeding toward a trial date, other factors served to buttress the insurer’s determination that fault for the accident rested solely with Fairman and not with its insured. Experienced counsel whom it had retained to represent Parsons’ legal interest came to the same conclusion after having conducted discoveiy. Having questioned Fairman first hand at his deposition, Attorney Mazurczak concluded that Fairman’s self-serving version of the accident, that it somehow must have been attributable to Parsons’ conduct rather than his own, was not likely *233 to be credited. That Fairman was alleged to have been operating uninsured and with a license suspended for past impaired operation, while not determinative on the issue of fault for the accident, were factors which reasonably could be considered when Mazurczak had communicated to Longo the conclusion he had reached that Fairman would not be a strong witness in advancing that theory of the case. The view expressed by Mazurczak, an experienced trial attorney with a first hand view of Norfolk’s insured, Parsons, and of the second alleged tortfea-sor, Fairman, reasonably reinforced Longo’s assessment that its insured was not contributorily responsible for the accident.
In arguing her claim that the insurer violated a duty to her, the plaintiff presses an assertion which focuses on the rule that a tortfeasor may be liable to an accident victim who is without fault even if he or she bears a slight percentage of the negligence which resulted in that accident. G.L.c. 231, §85. The plaintiff has stressed the minimal necessary negligence of as little as one percent, as leading to a conclusion that the insurer was bound to have made a payment of significant damages on her claim arising from the accident. The plaintiffs argument misperceives the obligation of an insurer in factual circumstances such as those presented here. The fact that the plaintiffs burden at trial is to prove only that one percent of negligence on a particular tortfeasor’s part in order to trigger payment on her claim cannot be viewed as binding an insurer to pay in all cases in which an allegation of liability is asserted against its insured due to that modest threshold as to possible liability. To view that rule as to joint tortfeasor liability in the manner pressed by the plaintiff would mandate that payment be made in virtually all cases in which a claim has been asserted against an insured in circumstances in which the plaintiff bore no possible responsibility, premised upon the possibility that a finder of fact might determine the existence of that one percent of negligence in causing the plaintiffs harm.
The plaintiff also points to the evidence relating to the accident which came from Parsons herself as supporting her contention that liability should reasonably have been clear to the insurer. Specifically, Callahan notes the disinclination of Parsons to assert in her statements made to Shepherd and in her response to discovery that she recalled having been paying attention immediately prior to the time that her vehicle was in collision with Fairman’s. It is true that Parsons did express reluctance to vouch for her own awareness of the second vehicle prior to the accident, a position which seemed to have evolved somewhat, at least in emphasis, from the initial accounts which she had given to her insurance agent closer in time to the event. Parsons never had stated, however, that she was distracted in any way prior to the accident’s occurrence. Given the information available to Norfolk from other sources, as well as the whole of Parsons’ accounts of the accident, her reluctance to make that precise assurance under oath of her prior specific attentiveness to the Fairman vehicle before it had started to make its turn cannot be viewed as sufficient cause for Norfolk to have concluded that she bore responsibility for the collision which resulted in Callahan’s injuries.
The plaintiff has put forward as a second basis for liability under c. 176D the claimed failure on the part of Norfolk to have conducted a proper and appropriate investigation of the accident before it had reached its determination that its insured was not liable. Specifically, the plaintiff faults the failure of Norfolk to have interviewed or secured a statement from Sergeant Salois concerning the underpinnings of the conclusion he had reached as to the accident’s cause which was favorable to its insured. The trial evidence reflects that Shepherd did visit the North Andover police station on one occasion and that he did attempt unsuccessfully to contact Salois prior to the submission of his report to Norfolk. Most importantly, there is no evidence that any interview with Salois would have led to a change in Norfolk’s position on liability.[12]
Norfolk secured an investigator to assemble materials about the accident and to report back with his findings, which he did by means of two reports. It had obtained through its investigator statements from both drivers involved in the accident, secured with difficulty from one operator who refused to meet face-to-face, and from the second operator, Norfolk’s own insured, only after arrangements had been made to have her personal attorney present, as she was lawfully entitled. It had the initial accident reports of Parsons through her local agent, the police investigative report of Salois, and photographs of the vehicles involved and of the accident’s locus. It had at a later time a completed accident investigation report performed by an accident reconstruction specialist. No argument exists that Norfolk’s investigation of the accident fell below what was required of it under the provisions of c. 176D §3(d).
Finally, the defendant insurer has raised as a defense to the plaintiffs claim, an assertion of “reverse bad faith,” grounded upon a claim of collusion existing between Callahan and Parsons and their respective attorneys to advance the former’s claim to the detriment of the latter’s legal interest, but funded at the expense of the defendant insurer. That issue had been raised by Norfolk’s investigator, Shepherd, at an early stage in the case. Since the plaintiff here has failed to demonstrate statutory violations by the carrier, as set forth above, this issue need not be reached in deciding the merits of the plaintiffs case. However since that issue, which had been the subject of vigorous dispute during the trial, now has been raised in a supplementary post-trial submission filed by Callahan seeking to *234 strike assertions related to that claimed defense, the subject is addressed here briefly.
The suspicion which plainly was harbored by Norfolk’s representatives that its insured’s legal position was being undermined is not one which is absent of foundation. The apparent shading of Parsons’ version from her original statement, the lack of the conducting of routine paper discovery of Parsons by Callahan’s counsel, and the role played by Parsons’ personal attorney, O’Connor, in her input into discovery being handled by experienced tort counsel Mazurczak, while not proving collusion, warranted some level of wariness on Norfolk’s part. Indeed, other matters not known to Norfolk at the time, but which were disclosed in discovery in this lawsuit would serve legitimately to accentuate this concern on the insurer’s part. These would include the joint fact investigation conducted by Abramowitz and O’Connor at the accident scene, the apparent sharing of information and opinion by O’Connor with Abramowitz which could be viewed as unhelpful to Parsons’ legal position, and O’Connor’s receipt of a legal fee from the proceeds of Norfolk’s payment to Abramowitz, subsequently returned, which was grounded in the judgment secured by Callahan in her lawsuit against O’Connor’s own client.[13]
While it is not necessary to reach the issue of the affirmative defense raised by Norfolk to decide this case, the insurer’s action in raising this issue, in the circumstances presented here, was not inappropriate. [14]
Order
After full consideration of all of the evidence including the exhibits, judgment is entered for the defendant on the plaintiffs complaint.

These exhibits, a series of color photographs of each of the two vehicles, were in the possession of Norfolk at the time they were assessing the issue of liability for the accident.

Parsons did not provide to Amero a great deal of detail about the accident at that time. The fair inference from Exhibit 8 and from Amero and Parson’s testimony at trial is that her statements to the agent were consistent with Fair-man having been wholly at fault in the accident.

Shepherd never spoke to Salois, although the court credits his testimony that he had left his phone number at the North Andover station and requested Salois to call him.

By that point, it is fairly inferential that Parsons had learned that the second driver in the collision, Fairman, was not insured. She had learned by then or soon thereafter that her own vehicle carried $250,000.00/500,000.00 in bodily injury coverage, but only $20,000.00/40,000.00 in uninsured coverage. Callahan was a named insured on the policy. Within one month or so after the accident, Parsons and Callahan raised their underinsurance coverage to match the bodily injury coverage amount.

Fairman, whose car was totaled as a result of the accident, has never asserted a claim for property damage against Norfolk based upon a claim of Parsons’ negligence.

O’Connor had referred Callahan’s claim to Abramowitz. Abramowitz had agreed that he would provide a referral fee to her for any monies recovered by Callahan. O’Connor’s legal services on behalf of Parsons involved assisting in filing Personal Injury Protection forms and in representing her in her interviews with her insurer. When Norfolk assigned an attorney, Michael Mazurczak, to represent Parsons in the lawsuit which Callahan ultimately brought against both her and Fairman, O’Connor remained involved in the case, attending meetings with him and attending Parsons’ deposition as her personal counsel. During the course of her representation of Parsons, O’Connor had no written fee agreement with her, and she never sought nor was she paid any legal fee by Parsons.

In his testimony, Shepherd stated that the statement was stricken at O’Connor’s specific insistence. This is not consistent with his characterization of that occurrence in his later report to Norfolk, and Shepherd’s testimony on this point is not credited.

Both Parsons and Callahan were now insistent that Callahan had warned “watch out" before the collision, something which Parsons had never mentioned in her statements to,the insurance agency employees or in her accident report. Callahan’s own statement as given to Shepherd about this issue was imprecise as to the distance between the vehicles when she had noticed the Fairman vehicle and allegedly warned Parsons.

In their discussions about the case, at least some of the information which O’Connor provided Abramowitz could be viewed as detrimental to Parsons’ legal interest in the litigation. (See Exhibit 35, File Notes of Abramowitz, in which he references O’Connor’s relaying of her client’s recollections as to the duration of the green light as she had approached it and O’Connor’s comment concerning the likelihood that this may have caused Parsons to be traveling at a greater rate of speed.)

While he was asserting a claim to significant compensation against Norfolk premised upon the assertion of Parsons’ negligence as a cause of the accident, Abramowitz did not during the course of his representation of Callahan conduct any written discoveiy of Parsons.

While the check was payable solely to Callahan, it was endorsed by both her and Parsons at the time that it was negotiated. (Exhibit 26.) While the funds ultimately ended up in the joint control of both women, this practice did not differ from the normal conducting of their financial affairs, as their assets had been effectively pooled during the duration of their multi-year relationship.

Salois testified at trial of this case, and there was no evidence adduced which altered in any material way what Norfolk had known about his investigation and conclusions in October of 2004.

During trial, counsel for Callahan attempted to defend the issuance and receipt of the check, arguing that he had only looked to Parsons’ insurance proceeds and never envisioned pursuing her personal liability had any judgment exceeded her policy limits, contending that this obviated the ethical issue presented by Parsons’ counsel sharing in the Norfolk payment. Looked at in the most charitable light, that view must be characterized as myopic.

In her supplemental post-trial submission, the plaintiff has moved to strike any assertions relating to the claim of reverse bad faith, and has appended as support a recent trial level case, Moriarty v. Sullivan, et al., Hampden Superior Court Civil Action No. 2004-1004. The facts of that case are wholly inapposite to the present, and the post-trial motion to strike is denied.